May it please the court, counsel, Sergio Garcia for Mr. Quesada Rojas. Mr. Quesada Rojas was an illegal alien without prior criminal convictions, prosecuted specifically under the founding prong for his attempt to leave the country and to stop being an illegal alien, for his attempt to simply do what Congress wanted him to do, leave. However, a review of the statutory interpretation of the words found and in, which is a question of law, review under a de novo standard, reveal that Quesada Rojas was not found nor in as a matter of law within the meaning of section 1326. For purposes of argument, I'm going to address first the in component of the founding prong and then we'll move on to the found component. Quesada Rojas was not in as a matter of law within the meaning of section 1326 because this court requires that to be in, a person has to be physically present and free of restraint. Clearly, at the port of entry, detained, and under surveillance, Quesada Rojas was not free of restraint. Recently in Macias, he was on the bus before they got on the bus. He was on the bus in the United States before they entered the bus and placed him in detention. So he was certainly in the United States, even if it's only a nanosecond before he was apprehended. Judge, our position is that he was on American soil. We don't dispute that at the boundary line when he arrived at the port of entry, but when he was at the port of entry, after he approached immigration authorities, they encountered him. And at that time, he was not free of restraint. I'll have to check the facts. I had understood they entered the bus in which he was riding. Is that correct? The bus arrived at the port of entry, at the boundary line, and immigration authorities went into the bus. And what did they do? They asked for documents, and they asked Quesada Rojas for a document. And that's the first time that he admitted to being there unlawfully. It's not like he, these other cases involve people landing on a plane and immediately seeking out some officer and saying, I shouldn't be here. He's sitting on the bus hoping no one's going to ask him anything, and then as soon as they do, he then admits it, which is very admirable, but I don't see how that with all due respect, we disagree. Quesada Rojas was not found within the meaning of section 1326 because the record reflects that he voluntarily purchased a bus ticket. He voluntarily boarded the commercial bus, traveled to the port of entry. Common sense tells us that as a previously deported alien, he obviously knew that he was going to encounter immigration authorities at the port of entry. That's where they are, particularly at this- They don't board every bus and ask every person everything. They don't have to. They can, but they also can, if there's a long line, they can choose to bypass this bus or that car or, you know, whatever. True. The record clearly reflects that Quesada Rojas knew how to avoid immigration authorities if he wanted. That's how he came in the first time. He paid a coyote, and he avoided it. This time, he purchased a commercial ticket for a commercial bus. He knew he was heading to the port of entry, and common sense tells us that as a previously deported alien, he knew he was going to encounter immigration authorities. It is illogical to think that he thought the bus was going to surreptitiously going to leave the country. But you are basically asking us to make a fact-finding about what's in his head when he had a bench trial and that went against him. I mean, I don't understand why we're sitting here as hypothesizing what he might have been thinking in buying this appellate court to do. I'm simply asking you, Judge, to determine whether he was found and whether he was in. And at that point, he has to be both found and in. And our position is that he was not found because he, to be found, this court has said that the alien has to be discovered. And to be discovered, immigration authorities have to be actively seeking for the alien, not passively waiting at the port of entry until the alien shows up. And that is why this court has held that when a person voluntarily approaches a port of entry, that person cannot- I mean, this is really a port of exit. I mean, he's leaving. So your theory that he knows he's going to be checked as he leaves, I mean, I recently drove to Canada. I was checked going into Canada by Canada. I wasn't checked by the United States for leaving. So I don't know that any- but we can assume, contrary to what the district court found, that somebody knows they're going to be checked, and therefore they're not really found. Well, certainly the board in Canada and the board in Mexico are a little different. I mean- I understand that, but I'm saying that you don't know that you're going to be checked by the United States side when you're leaving. Our position is that in this case, he approached him first, not vice versa. And because- You approached him in the bus? Yeah, he got on the commercial bus, Judge. He knew he was going to the port of entry. The analogy would be like if I go to your house and knock at your door, right? You open the door. You can say that you find me, but only because I knock at your door. I am the one that So our position is that Quezada Rojas was not found because he approached him first, not vice versa, and he was not in because he- You didn't approach him first. Your theory is that buying a bus ticket constitutes an approach to the border officials, and I don't accept that. Not as a matter of law, anyway. You can make that argument to the trier of fact, certainly, but you're asking us as a matter of law to say if you buy a bus ticket in the United States heading to Mexico, you are sort of exempt from prosecution for having been here. Well, the law in this circuit and other circuits is clear. When a person voluntarily approaches a port of entry, a boundary line, which is the same boundary line whether you're going in or you're going out, it's the same piece of real estate. A person cannot be considered to be found when he approaches voluntarily the port of entry within the meaning of- The line you're on does matter. I mean, if I'm standing on my property and my neighbor's on their property and I walk to the other side of the line, so to speak, I'm now trespassing on their property unless I have their permission. The line matters. Judge, it would be contrary to the principles of statutory interpretation to give two different meanings to the same word, found. Found means something when you come into the country, and when you are approaching the same port of entry, it means something different. None of the cases that we cited, which are published opinions from this circuit and from other circuits, stand for the proposition that the meaning of the word found changes simply because the alien is attempting to leave the country. Before I run out of time, I would like to address the in-component of the founding prong. Macias is a recent decision from the Second Circuit, Judge. In that case, the alien also attempted to leave the country, was stopped at the port of entry, charged under the founding prong, and in reversing, the Second Circuit noted that the doctrine of official restraint also applied to the founding prong, and that it requires the government to prove that the alien is in the United States free of restraint. In that case, the Second Circuit noted the Supreme Court precedent holds that when an alien is at the boundary line, he is not considered in. Particularly, they cited a case, Kaplan v. Studd, 1925. This is a case where the Supreme Court has to determine whether an alien detained at Ellis Island was considered in for purposes of 1326. Now, is this your official restraint issue? Correct, Judge. The government says you failed to raise that. In fact, you disavowed it in your motion to dismiss and apparently failed to raise it at your Rule 29 motion for judgment of acquittal at the close of the government's case in chief. You dispute that in your reply brief, so tell us exactly how you presented it. Well, that is, it's contrary to the government's assertion, Judge, and we did raise it in the Rule 29 motion at the bench trial. The record shows at page 100, 103, 106, 107, and 134. And even under plain error, which we are not agreeing that's the correct standard, the plain error review standard was used in Macias. And in Macias' case- Well, let me just get the procedure. Are you now saying you did not raise it in your motion to dismiss? We did not raise it in the motion to dismiss, but we raised it at the bench trial. Right. In a Rule 29 motion. And the pages were 100, 103, 106, 107, and 134. With respect to the- The facts in Macias were different because he had actually gone on to the Canadian side and was refused entry by the Canadian authorities and then attempted to come back into the United States. So that's not what we have here. True, Judge, but the Second Circuit considered other factors. For example, they said that Macias was never legally in Canada and that he was forcibly returned in handcuffs to the US authorities. They noted that he was on Canadian soil, but not legally in Canada. Just like he was on American soil when he was brought to the American authorities, but not found in within the meaning of Section 1326. So if he wasn't legally in Canada, and if he wasn't legally in the US, where was he? He was at the boundary line exactly where Quesada Rojas was. The Second Circuit noted- I just keep thinking that where you are relative to the line matters. And you're trying to say either side of the line is the same, and then to me that makes the line meaningless. Judge, with all due respect, the port of entry or boundary line doesn't change simply because you're approaching from the north or the south. No, the line doesn't change, but where you are, if I'm in Mexico and I approach the line with the United States and I never cross it, I can't be prosecuted for entering the US one way or the other. If I'm in the US on the US side of the line, then I'm subject to whatever the rules are governing that. So to me you're saying that the line, whichever side you're on is the same difference, and I don't understand the purpose of the line if it doesn't matter which side you're on. We're not contending that Quesada Rojas was not on American soil. He was on American soil. But we're contending that he was not in as a matter of law because he was not free of restraint. Now— Let me ask you this. Is everybody—so if I'm in a car, you know, on my way to Tijuana from San Diego, and I approach the area where you're going to go from the US to Mexico, am I now under restraint? If I'm just in my car, I'm driving along, I'm now under restraint because I'm just approaching the border between the US and Mexico? It could be, Judge. That's your argument, right? You're saying you're under restraint as soon as you're in an area that Border Patrol could stop you. Our contention is that when he was detained by the officer, he was under restraint. He was not free of restraint. He was detained. And, Judges, we're simply asking that this Court do what the Second Circuit did in Macias, not to punish him for doing the one thing that Congress wanted him to do, to leave. And the notion of not punishing individuals for doing what Congress wants them to do is not new to the Macias case. In fact, we cited a case from the Third Circuit. See, isn't that a separate question? That's really a prosecutorial discretion argument. I could see sitting down with the US Attorney's Office and saying, why are you prosecuting this guy? You're trying to get people to leave, and you're prosecuting this guy. That is totally a legitimate argument to the prosecutor, but that isn't what we do. We don't exercise that. There's crimes I've presided over as a judge that I wouldn't have prosecuted if I were the US Attorney, but that's not my call. Our contention is that to give effect to congressional intent, this Court should not punish Quezada Rojas for simply doing what Congress wanted him to do. And as I was saying, we cited the Cuevas case. In that case, it's a Third Circuit case. Arguably, Congress didn't want him to enter the country illegally after he had already been removed. That is true. That's what Congress didn't want him to do. And that is true. He's been sentenced to what, time served? Time served. He's already been removed to Mexico? Yeah, he was zero to six, no prior convictions, and that was the sentence. He has now been removed to Mexico. Correct. So the only possible reason this isn't moot is because he might at some time want to reenter the United States legally. He has a daughter that is a US citizen, and yes, that is a contemplation. This is a person who was basically abided by all the laws except that he came to work to the United States. But he never had a criminal record, and yes, he is home now with his family. Just briefly for purposes of time, we're contending that Quezada Rojas was not found as a matter of law because he approached immigration authorities first, not vice versa, and that he was not in because he was detained at the port of entry based on the official restraint doctrine. And the government also contends that unlawful entry is a continuing offense, and that's why Quezada Rojas' claim failed. However, the fact that unlawful entry is a continuing offense is irrelevant for two reasons. Number one, this court has held that unlawful entry is not complete until the alien is found in, and we are contending that he was not found in as a matter of law. And second, this court has held that a continuing offense terminates when the legal activity is voluntarily ended, and as a matter of law, when Quezada Rojas voluntarily approached the port of entry, his illegal activity was ended because at that time, based on the official restraint doctrine, he was no longer in within the meaning of Section 1326. Thank you, Mr. Garcia. You've saved time for rebuttal. Thank you. Ms. Blatt? May it please the Court and Counsel, Mayor Blatt for the United States is aptly in this matter. Before you begin your argument, would you please respond to the claim that the government pressed in its brief at page 22 that the official restraint issue was not raised in the district court? And you've heard the pages cited in the record. I believe that certainly with regard to the motion to dismiss, that I believe is at page 34 to 35 in the record, and there is a disavowal of the official restraint doctrine. And then, again, at page 108, which follows the page numbers that Mr. Garcia just mentioned, at page 108, note 5, there is also, I believe, a disavowal there. But for the purpose of argument here today, we would contend— Of course, if it was disavowed affirmatively, then it's not even reviewed for plain error. It's waived. That may be the case. For the purpose of my argument here today, though, I'm going to assume, and I think that we can prove, that under any standard of review, the argument doesn't fly. For these reasons, Roehouse's 1326 conviction should be affirmed by this Court because his voluntary presentment and official restraint doctrine—sorry—arguments fail, both as a matter of law and fact. As to the voluntary presentment issue, the essential problem here is that Roehouse conflates voluntary presence at the POE with the legal notion of voluntary presentment, which is a term of art. This is the same argument that was made by the defendant in Felix Hernandez, which was a case that this Court recently decided. And there the Court found that an undocumented alien's subjective intent or subjective desire to leave the country could not support a claim of voluntary presentment because presentment relates to entry into the United States. And this Court, again, in Felix, also rejected defendants' reliance upon the Angeles Moscote and Canales Jimenez cases, which are the same cases that Mr. Roehouse relies upon here. With regard to those precedents, the Felix Hernandez Court stated that in those cases, the alien defendants were attempting to enter the United States through a port of entry. Here, Felix had already illegally reentered the United States without detection and was attempting to exit the United States through a port of entry. Now, why on earth was this case prosecuted? I mean, whatever the found in ultimately is determined to mean, why would you waste the resources of the United States prosecuting a guy who was trying to leave? Sound bound operations are conducted for a number of very legitimate reasons, including finding cash, finding ammunition, and occasionally finding armed— No, I'm not saying why would you check the bus. Okay, that's fine. You check the bus. But there's no indication this gentleman had anything other than he just shouldn't have been there. And he's on his way out. So I guess I'm just trying to understand the thinking. I mean, again, it's a matter of prosecutorial discretion. I get that. But it doesn't make a lot of sense to me. Well, he also was actually—I mean, he is a recidivist illegal reenterer. This is not—in fact, in the statement that we attached to the, I believe, our response to the motion to dismiss, or it might have been the Rule 29, there is an affidavit from him. And there he admits that he had illegally reentered four or five times. So it's not just that he was doing this for the first time, but it was—these were repetitive actions on his part. Was there anything in the record that shows that every bus, every car, every person leaving the United States is checked by United States authorities? I mean, his argument is you buy a bus ticket, you know you're going to be checked. Was there evidence in the record to that effect? I believe in the government's summation at the end of the bench trial, the attorney for the government states that southbound operations are not done all the time. And, in fact, that is true. They're not. And there's not evidence to the contrary, in other words. There's not evidence presented that every bus—so if you buy a ticket on a Greyhound bus leaving from Dallas to Mexico City, let's say, are you assured that you're going to be checked by U.S. authorities on your way out? There is no evidence to that effect. In fact, as I recall, the defense did not present evidence. That is correct. The only difference between Felix Hernandez and this case is that in Felix Hernandez, the defendant was sitting as a passenger in a pickup truck in the same area that Mr. Rojas was encountered at, when he was encountered by CBP agents doing southbound operations at the POE. And, therefore, like Felix, and despite any subjective intent that either man may have had to leave the country, Rojas was properly found in the United States and, therefore, was properly convicted of violating 1326. Okay, so what about this business of once—okay, so he's on the bus. I don't really buy this idea that buying the ticket is tantamount to declaring yourself to customs. But now he's on the bus, and they've boarded it. Okay, the Border Patrol guys have boarded the bus. Is he now under restraint? Not as the official—well, no, he is not under restraint. And, certainly, with regard to at least how both the Ninth Circuit and the Second Circuit discuss official restraint, he's not under official restraint, even for the purposes of those cases. And I would emphasize— He's free to leave. So if I'm on the bus, I'm on this same Greyhound bus from Dallas to Mexico, it stops at the border heading into Mexico, and a bunch of Border Patrol agents board the bus. Can I jump off the bus and go, I don't want any part of this, I'm going home? Or do I—am I going to then subject myself to prosecution for jumping off the bus? Well— I don't mean while it's moving. Right, right. Get off. Right, right. I get that part. No, I mean—well, we couldn't prosecute you for jumping off the bus, but if you jumped off the bus, we would ask you the same questions that we would have asked you when you were on the bus. And he willingly and freely and voluntarily volunteered the information that he was illegally in the United States and that he had illegally handed— So then aren't you really under restraint? I mean, to me, the notion of not being under restraint is I'm free to leave. If a police officer walks up to me on the street and starts asking me questions, and I say, excuse me, I'm busy, and I keep walking, and they say, well, no, wait a minute, you need to answer my questions, then I'm under restraint. If they let me go, then I'm not under restraint. We have a lot of cases about whether somebody's under arrest, under restraint, under detention, blah, blah, blah. It sounds to me like you're saying this guy was under restraint. Well— Because you're not really free to leave, because if you jump off a bus and they're still going to ask you questions, then are you really free to leave? Well, official restraint option doesn't—is not like restraint in the context of the Fourth Amendment. It's something that's very, very specific to entry cases, and it is something that requires constant surveillance. Both the Ninth Circuit and the Second Circuit hold that. And again, I would emphasize to the court that this court has never adopted the official restraint doctrine, nor would I suggest that the facts under which it could adopt it would be from this case. Nevertheless— So explain to me how official restraint in this context, these Border Patrol have jumped on the bus. How does that differ from colloquial restraint? Because, for example, as the Ninth Circuit stated in a case called Moniz-Hawkins, the court there said that the doctrine of official restraint is premised on the theory that the alien is in the government's constructive custody at the time of physical entry—entry into the country. Mr. Rojas has admitted he was in the United States. He was in when he physically entered or reentered the United States illegally. He did that months before he was ever interdicted, which was in November of 2012. And that's one of the reasons why this case does not present good facts for official restraint, because official restraint applies when, for example, there is an undocumented alien on the other side of the river. The POE is right there. They have eyes on with binoculars, and they watch as the alien crosses the river and arrives at least physically within the United States. But they have been watching him since he was not in the United States. That is official restraint. And then, of course, they interdict him when he actually enters physically. But he has—so those—that notion really applies in the entry context. For official restraint to apply in this case, we would have had—we, the government— would have had to have eyes on Mr. Rojas from the time that he illegally reentered near Matamoros, from the time that he went to Denver, worked in a ceramics factory, and then decided that he was going to return to the United States, and then got on a bus—what? He said return to the United States. I'm sorry. Return to Mexico. Mexico. Yes. And then followed him all the way down to the border. That is official restraint. That is constant surveillance. That's why the doctrine doesn't apply here, because— What about his essential argument that it's a natural extension of this eyes-on idea, that if the eyes are on you, you're not free to leave, you know, colloquial restraint, because they boarded the bus, then you can't be found because you were under that restraint at that point, the eyes-on matter at that point, because that's when they supposedly found you. How do you—because that seems to be at least a part of the essence of his argument, so I just want to make sure you've responded to him. Right. Well, the thing is is that we do not dispute that Mr. Rojas' subjective intent to want to return to Mexico was genuine, but that doesn't negate the fact that he took a calculated risk that on that day he was going to be able to leave the port of entry, exit the country, because he felt that on that day there weren't going to be southbound operations on the bridge. Unfortunately for him, that risk—unfortunately for him, he was found on the bus, and there were southbound operations being conducted that way. I'm sure there were days where other undocumented aliens are on buses that go southbound across the bridge, there's no southbound operation, and they leave the country undetected. I'd like to discuss for just a moment what the facts of Macias are, because Mr. Rojas relies so heavily upon it, to distinguish it for the court and to demonstrate why neither under the Ninth Circuit's formulation of official restraint nor under the Second Circuit's formulation would it apply in this case. Mr. Rojas, in his 28-J letter, says that he is just like Mr. Macias, but the facts indicate otherwise. The Second Circuit characterized Mr. Macias' immigration history as very checkered. He was deported in 2000, but illegally returned in 2001, lived in Texas, and opened a business. Ten years later, for reasons unknown to the court, he decided to leave the United States. He traveled to Niagara Falls, and in an attempt to enter Canada, left the United States by the Rainbow Bridge. This is where the facts diverge from this case, because Quesada Rojas never left the United States. He's still found in the United States when he is actually encountered. So back to Macias. Macias crosses the bridge. He arrives on the Canadian side of the bridge. He's detained for further inspection by Canada's equivalent of the Border Patrol, and he's ultimately refused entry because he lacked passport or visa. He was then given what is euphemistically called a Canadian Allowed to Leave document, which is created when someone coming from the United States tries to enter Canada, but is refused entry into that country. And here's the kicker. The Canadian Border Patrol put him into handcuffs and walk him back across the Rainbow Bridge, and they hand him over to American CBP. And CBP immediately does a records check, finds his criminal history, and he is ultimately charged with being voluntarily present and found in the United States. Going back to your point, Judge Haynes, these are facts that show that he was in official restraint. He was handcuffed. He was forcibly walked back across the bridge and handed over to the American authorities. That is not the case here. There is simply no evidence in this case of official restraint in any way. Also, were this court to rule for Mr. Rojas, that would have the effect of turning 1326, which is a general intent statute, into a specific intent statute. And the problem with that is, where do you draw the line? How do we determine this specific intent? Is it at the POE? Is it two blocks north of the POE, when the undocumented alien is walking south toward the POE? Or is it, as Mr. Rojas suggests here today, when an undocumented alien boards a bus headed to a southern POE from Denver or some other remote part of the United States? It's an unworkable standard. And anyone who would be interdicted, any undocumented alien that would be encountered anywhere in the United States, could then claim, well, I'm headed home. And that would become a defense to the offense. Finally, I wanted to just address the district court's comments at the bench trial, because Rojas also relies very heavily upon them. He seems to suggest that they help his cause. And I would suggest to the court that they don't. Because when read in context, the district court seems to be articulating the fact that because the phrase found in is not modified anywhere in the statute, it doesn't matter whether you are found in the United States after you have entered and are headed north, or if you are headed south and are about to exit. Either way, the court finds that you're in the United States. And if the court had meant something different, then it would have granted the Rule 29, which it did not do. The statute only requires that you are in the United States once your illegal reentry has been completed. Based on these well-established principles, Rojas admitted all of the necessary factual predicates for a 1326 prosecution, which is that, one, he was a native of Mexico and an alien to the United States, who, two, had been previously deported, and was, three, in the United States when he was stopped or encountered by immigration authorities without permission to enter the United States. That's all from Felix. Felix Hernandez applies in this case. For all these reasons, the government requested this court affirm Mr. Rojas's conviction. If there are no further questions from the court. Thank you, Ms. Blatt. Thank you. Garcia, you've saved time for rebuttal. Thank you, Your Honors. Just briefly, to be in this country, Judge, you're correct. To be in within the meaning of Section 1326, you have to be able to mingle among the masses and be free to move. In this case, at the bus, with the immigration authorities, Quezada Rojas clearly was under restraint. With respect to Macias, Felix Hernandez, the case that it was decided here with similar facts, it is an unpublished decision, and in that case there's two important critical distinctions. First, Felix Hernandez did not raise the official restraint doctrine, and second, he stipulated that he was in within the meaning of Section 1326. That's what the court noted in that decision, so that is a big difference. Second, we are not disputing that, or we're not contending that at the port of entry or boundary line, Quezada Rojas is beyond any prosecution. We're not contending that, Judge. The 11th Circuit on this precise issue noted that the alien could be subject to any other statute, criminal, state, or federal. For example, if Quezada Rojas would have robbed the 7-11 before he approached the port of entry, he could have been prosecuted for robbery. If he would have been transporting weapons, he could have been prosecuted for that. He, however, cannot be convicted under the founding prong of Section 1326. Judges, our position is that Quezada Rojas, when he voluntarily approached the port of entry, he was not found within the meaning of Section 1326. When he was detained at the port of entry at the boundary line based on the official restraint doctrine, he was not in within the meaning of Section 1326 as a matter of law. Under the statute, he must be both, found and in. He was neither. He must see as the Second Circuit observed. The government attorney says that at trial in the Rule 29 motion that you disavowed the restraint issue. Now, what language will we find in the record that might lead the government to think that? I'm not sure, Judge, but I know that if you go to the benches— Did you try this case? I'm sorry, what? Yes, I was at the bench trial, and if you go to— Did you familiarize yourself with the record before you came here today? Yes. So do you recall what in that small record might have been taken by the government to be disavowed? Yes, the pages that I cited, Judge, 100, 103, 106, 107, and 134, reflect that we did raise the official— Okay, well, the footnote is footnote 5, and I think what she's referring to is it says you're distinguishing the case of Ramos Flores, and you say the issue raised by the defendant in that case was whether or not 1326 requires the government to prove he voluntarily entered this country so-and-so free from official restraint. That is not the issue raised by Quesada Rojas. That's, I think, what she's referring to. That's footnote 5 on page record 108. So I think she's saying that you're distinguishing a case by saying that case involved official restraint, and that is not the issue raised by Quesada Rojas, so she views that as a waiver or a concession. So what is your response to that? My response is that in the record, Judge, in pages 100—I think if you go to 100, 103, 106, and 134, you will see that we did raise the official restraint. And even if it was plain error, which we're not agreeing that that's what it was, Macias used that standard of review, and we're contending that Quesada Rojas also survives that high standard of review. Just briefly because of time, Judge, the Macias decision observed that because the goal of 1326 is to prevent illegal aliens from coming in and remaining in this country, it would be unjustifiable to punish him for doing the one thing that Congress wants him to do, and that is to leave the country. It noted that would create a disincentive if we punish illegal aliens for wanting to leave. Congress wants illegal aliens to leave the country, and to give effect to congressional intent, this court should follow the logic of the Macias case and the Cuevas case. The government's interpretation of the founding prong clearly frustrates congressional intent. If we were to hold that Quesada Rojas is guilty of the founding prong, we will be establishing that there is only two choices for these types of aliens, either remain illegally because you're going to be prosecuted, or attempt a dangerous crossing through the desert. Clearly, these two options are contrary to congressional intent and contrary to the goal of Section 1326. Thank you. Thank you, Mr. Garcia. Your case is under submission. The next case for today.